MICHAEL A. ATWELL          *
                           *
          v.               *    Civil Action WMN-10-1378
                           *
AMERICAN SUGAR REFINING, INC.   *
                           *

*    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM

Pending before this Court is Defendant's Motion for Summary Judgment, ECF No. 12. The parties have fully briefed the motion, and it is ripe for review. Upon consideration of the pleadings, facts and applicable law, the Court determines that no hearing is necessary, Local Rule 105.6, and Defendant's Motion for Summary Judgment will be granted for the reasons set forth below.

## I. BACKGROUND

This is a case that involves claims of discrimination and retaliation. Plaintiff Michael Atwell, an African-American man, was employed by Defendant American Sugar Refining, Inc. ("ASR") as a Packaging Maintenance Foreman at the Domino Sugar Plant in Baltimore from February 26, 2007, to October 16, 2008.[1] His primary duty was to supervise the mechanics responsible for maintaining and repairing the conveyer belts and other high

---

[1] The facts recited herein are the "undisputed facts" as stated in Defendant's memorandum. Plaintiff did not dispute the facts or offer his own recounting, beyond his own affidavit, in his Response to Defendant's Motion for Summary Judgment. As such the facts as stated by Defendant and as contained in Plaintiff's affidavit, are assumed to be true for purposes of this motion.

speed machinery used in the plant's packaging operations.
Atwell did not have any prior experience working in production
or as a packaging mechanic.

Because the plant operates 24 hours a day, seven days a
week, ASR typically employs a total of two to three Packaging
Maintenance Foremen to ensure continuous supervision of the
packaging mechanics. In July 2007, ASR hired Viktor Afanasenko,
a white man, to be the new Packaging Maintenance Manager, the
position responsible for supervising the Packing Maintenance
Foremen, including Atwell. Shortly after Afanasenko was hired,
the second Packaging Maintenance Foreman left, leaving Atwell
and Afanasenko alone to manage the whole packaging maintenance
department. Atwell acknowledged that during this time he and
Afanasenko had a "great" relationship and were able to
communicate well to keep the department going. Atwell Dep. 95-
96. Some time later ASR promoted Al Danowski, a white man, to
Packaging Maintenance Foreman.

On October 5, 2007, Atwell received his first performance
review. The review was completed by Ronald Beswick, a white
man, the Production Manager, and indicated that there were
several areas in which Atwell needed improvement. The review
form also indicated, however, that a rating of "needs
improvement" is appropriate for employees new to a position that
requires additional training. This caveat suggests that at the

2

time of the review Atwell, who had only been on the job for 7 months, was performing as expected.  Notwithstanding, several written comments on the review state that there were specific skills in which Atwell was deficient, specifically "his ability to prioritize and meet deadlines"; needing "to be more results oriented"; working on "following up . . . to ensure the assignments and repairs are being completed on time and correctly"; and engaging more with his staff "to resolve conflicts of both the personnel and equipment nature."   Mot. App. 15.  The comments also state that Atwell "at time[s] shows signs of having the hourly mentality."   Id.

Atwell alleges that around January 2008 the relationship between he and Afanasenko began to degrade and Afanasenko began to engage in conduct that created a hostile work environment. Afanasenko would harass him; put him down in front of the mechanics he supervised; and undermine his authority by telling the mechanics to disregard Atwell's instructions because Atwell does not know anything.  Atwell Dep. at 102, 295.  Afanasenko treated Atwell's white counterpart, Danowski, very similarly in that Afanasenko made it clear that he did not like Danowski, told him that he did not know anything, and gave him low performance reviews despite his 30 years of experience.  Atwell Dep. at 105-106.  Afanasenko, however, treated the third

Packaging Maintenance Foreman, Gary Ward (white), who was promoted by ASR in June 2008, very favorably.

In April or May of 2008, when Atwell met with Afanasenko to discuss one of the African-American mechanics that Atwell had brought in, Afanasenko said that "[a]ll the black mechanics here need to be fired, because I don't believe there is a good black mechanic." Atwell Aff. ¶3. This is the only reference to race by Afanasenko that Atwell recounts.

On two occasions in April 2008, Afanasenko met with Atwell to discuss performance issues. On April 17, he met with Atwell regarding a problem with the scheduling and overtime records for which Atwell was solely responsible. When the records were audited, it was discovered that the regular labor and overtime entries were inaccurate, which affected budgeting and caused ASR to have to scramble to correct the records in time for their submission to the Union. Then, on April 18, Afanasenko met with Atwell to discuss several occasions in the prior week when he left work early without notifying anyone and leaving his mechanics unsupervised. Atwell refused to sign both memos recapping the meetings.

In May 2008, Atwell spoke to Ron Frey, the human resources manager, about the harassment and perceived discrimination. There is no indication that Frey undertook any investigation of the complaint at that time. Then on July 28, 2008, after

becoming aware of the conflict between Atwell and Afanasenko, Frey held a meeting with the two men.  Atwell said that at the meeting Frey merely told the men to resolve their differences and learn to get along.  Atwell Aff. ¶7.  Frey characterized the meeting a little differently and said that he warned Atwell that, because Afanasenko is his manager, he needed to show appropriate respect.  Frey Aff. ¶5.

On August 10, 2008, Ronald Beswick, the Production Manager, replied to an email from Atwell and expressed his dissatisfaction with the way Atwell handled a short staff situation on his August 9th shift.  He commented that Atwell "did not take ownership of the situation" and failed to come up with a plan to resolve the issue, instead calling his supervisors at home to make the decisions for him.  Atwell responded via email, saying "instead of you noticing that there was a problem all you can do is lash out at me.  Well if this is the way you feel then so be it.  But every time I am left with the lack of support I received yesterday from my counterparts and you I will always voice my mind."

On August 20, 2008, Afanasenko gave Atwell a one day suspension due to insubordination and negligence that led to a significant production loss.  On that occasion, Atwell allowed his department to be understaffed and he himself left for a doctor's appointment and did not return.  He did not notify

Afanasenko, his direct supervisor, and when asked about his reason for not telling Afanasenko said that "if [Afanasenko] talked to him, [he] would [have known]".  Ray Fairman (black), the Production Manager, met with Atwell, Afanasenko and Beswick to discuss the circumstances of the suspension.  In an email to Frey dated August 21, 2008, on which he copied Stu FitzGibbon, the Plant Manager, Fairman stated that he supported the suspension, and had explained to Atwell that "[Afanasenko] was his boss and he needed to show him respect," and that he "must take a more proactive and flexible approach to his day to day job function."  Fairman also noted that

> [t]his is not an issue of race, but an issue of two people that have personalized their differences and as a result the interpersonal relationship has turned unprofessional and at times petty.  Unfortunately for Mike he doesn't understand the power base is not with him, but with [Afanasenko] and he must learn to adjust to [Afanasenko's] style of management or potentially be forced to move on to another company.
>
> ECF No. 12-4 at 10.

On August 28, 2008, Atwell received his second performance review, this time completed by Afanasenko.  Atwell mainly received "Needs Improvement" ratings on the sheet scoring his Standard of Performance with regard to Business/Performance Objectives, and all "Needs Improvement" ratings on the Competencies section.  The comments note several issues, including Atwell's "lack of accountability and not taking

ownership," his "victim's mentality behavior when it comes to getting results," his "lack [of] the sense of urgency it takes to be effective in the fast paced environment known as manufacturing management," and that the consequence of his poor attitude is reduced performance in his department. Atwell refused to sign the performance review.

On October 9, 2008, Afanasenko sent an email with the weekend schedule to the three Packaging Maintenance Foremen. He assigned Atwell to the "Saturday A-shift" and Ward to the "Sunday A-shift." Atwell responded the next morning by saying

> Explain to me I just do not understand. On Monday 10-6-08 your words was we change on Sunday so that will mean that [Danowski] will be working on Sunday. Now unless there has been an agreement that [Ward] will do it for [Danowski], Then why was I not asked first because [Ward] and myself worked last weekend so if there is someone who gets this weekend off it should be me since I worked last weekend.

ECF No. 12-4 at 14. Afanasenko replied by agreeing to work for Atwell on Saturday.

On October 10th thru 11th Atwell and Afanasenko engaged in another set of contentious emails. Atwell initiated the communication, copying FitzGibbon, and wanted to know why Ward stays and overlaps up to 5 hours into Atwell's shift, during which time Ward gives orders to the mechanics Atwell is supposed to be supervising. Atwell noted that "[i]f you two don't think I can handle the job then this is [sic] we need to discuss with

7

the higher authorities." Afanasenko replied saying that he "welcome[s] the help of everyone when it comes to shortening of downtime and increasing reliability [of production machinery]." He also stated that he cannot call the decisions Atwell made that day reliability-oriented. Afanasenko also requested that Atwell not email him during Atwell's shift on the floor and instead inform him in person. Atwell responded by saying Afanasenko never answers when he calls so he is unable to communicate with him face-to-face. He also said that Ward is part of the problem because he gave the wrong "fix" for some of the down machinery, and accused Afanasenko of "hiding him under your wing."

On October 13, 2008, Atwell made a complaint of racial discrimination, harassment, and hostile work environment to Frey. Frey told him that he would get back to him on Thursday, October 16, 2008.

On October 15, 2008, Atwell sent an email with his shift report from the prior day to Afanasenko and FitzGibbon, noting that "[m]y Boss [Afanasenko] was not here to go over it." The shift report noted one of the machines had a broken vibrating rail and the mechanic was taken off the repair because of a staff shortage; presumably this meant that machine was not used at all during the shift. Afanasenko replied directly to Atwell, suggesting that the problems he identified in the machinery were

based on another person's assumption and not Atwell's own
troubleshooting, which resulted in the machines being
unavailable for a prolonged period of time and a loss in
production. Afanasenko ended his email by noting "[t]his is not
the performance and results this company expects from you."
Atwell responded defensively, asserting that

> You fault me because in your words I make my judgment on
> someone's assumption, but isn't that exactly what you are
> doing with [Ward]. He has proven he does not know what is
> going on but is blowing smoke and you get lost in the
> cloud. . . The performance and results this company
> expect[s] you are not doing.

ECF No. 12-13 at 1.

FitzGibbon made the decision to terminate Atwell's
employment based on his assessment of Atwell's job performance
and because of the conflict between Atwell and Afanasenko, which
he perceived to be mainly the fault of Atwell, who refused to
cooperate or show appropriate respect for his manager.
FitzGibbon believed this conflict was negatively affecting the
operation of the business. On October 15, 2008, FitzGibbon
discussed the situation with Frey and directed Frey to fire
Atwell.

On October 16, 2008, Frey met with Atwell and informed him
that his employment had been terminated. He cited to "numerous
documented performance issues of the last year and a half;"
Atwell's inability to correct his leadership style and work with

other employees, specifically Afanasenko; the one-day
suspension; and the previous week's series of emails that
"indicate that [Atwell has] no intention of working with [his]
supervisor." Frey concluded by telling Atwell that

> It has become clear to me that you are not only continuing
> this pattern of insubordination, but escalating your
> hostilities to the point there is no longer any hope of
> trying to get you to understand that you must work with
> your supervisor. Therefore, you are being terminated as of
> today.

ECF No. 12-3 at 13.

On October 20, 2008, Atwell filed a charge of
discrimination with the Equal Employment Opportunity Commission
and subsequently received a Right-to-Sue letter. He then filed
suit in this Court on May 28, 2010, pursuant to Title VII of the
Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq. In Count I,
Plaintiff Atwell alleges discrimination based on race and that
his white supervisor, Afanasenko, created a hostile work
environment by belittling him and attempting to undermine his
authority in front of the mechanics he directly supervised and
that his race was the animus for Afanasenko's hostile conduct.[2]

---

[2] The Complaint, ECF No. 1, alleges facts as part of Count I that imply Atwell
was discharged because of his race. Atwell's deposition clearly indicates
that he believes that the only reason his employment was terminated is
because he made a complaint to human resources, and does not suggest that he
is pursuing a claim that he was terminated because of his race:

    Q:    Why do you believe you were fired?
    A:    Because I came to HR with a discrimination suit and HR didn't do
           anything about it. And the way HR wanted to handle it was get
           rid of one of the parties and I was the one they got rid of.
    Q:    Do you believe that there was any other reason why your
           employment was terminated?

In Count II, Plaintiff alleges that ASR fired him as retaliation because he complained about the discriminatory treatment. Defendant has moved for summary judgment as to both counts.

## II. LEGAL STANDARD

Summary judgment is proper if the evidence before the court, consisting of the pleadings, depositions, answers to interrogatories, and admissions of record, establishes that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying the portions of the opposing party's case which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The non-moving party is entitled to have "all reasonable inferences . . . drawn in its respective favor." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987).

If the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to summary

---

A:  Do I believe if there's any reason why my employment was terminated?  No.  I believe that's the only reason why, because I came to them with a discrimination suit or discrimination charge and they didn't do any investigation.  And the best way to eliminate it was to get rid of me.

Atwell Dep. 162-163.  Therefore the Court finds no reason to examine whether judgment should be granted for a claim of discriminatory discharge that Plaintiff is not pursuing.

judgment as a matter of law, the non-moving party must, in order to withstand the motion for summary judgment, produce sufficient evidence in the form of depositions, affidavits, or other documentation which demonstrates that a triable issue of fact exists for trial. Celotex, 477 U.S. at 324. Unsupported speculation is insufficient to defeat a motion for summary judgment. Felty, 818 F.2d at 1128 (citing Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986)).

Furthermore, in the employment discrimination context, "a subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief." Elliott v. Group Medical & Surgical Serv., 714 F.2d 556, 557 (5th Cir. 1983), cert. denied sub nom Elliott v. Group Hospital Serv., Inc., 467 U.S. 1215 (1984); see also Moore v. Reese, 817 F. Supp. 1290, 1295 (D. Md. 1993). The plaintiff must come forward with independent evidence establishing a material issue of fact in order to overcome the defendants' motion for summary judgment. Moore 817 F. Supp. at 1295.

## III. DISCUSSION

### A. Hostile Work Environment

To establish a prima facie case for a racially hostile work environment, Atwell must provide sufficient evidence so that a reasonable jury could find that Afanasenko's conduct was (1) unwelcome, (2) based on race, (3) sufficiently severe and

pervasive so as to alter the conditions of employment and create an abusive working environment, and (4) that there is some basis for imposing liability on ASR.  See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-184 (4th Cir. 2001); Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011).  Failure to make a threshold showing for any one of the four elements will result in a grant of summary judgment for the defendant.

It is undisputed that Atwell can provide sufficient evidence to meet elements 1 and 4.  Atwell has offered some evidence to suggest that Afanasenko's conduct was based on race.[3] Nevertheless, even assuming this evidence is sufficient to prove the second element, Atwell will not be able to survive summary judgment because the alleged discriminatory conduct was not sufficiently severe and pervasive to satisfy the third element.

Atwell must show not only that he subjectively found the environment to be hostile, but that a reasonable person in his position would find it to be objectively hostile or abusive. EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).  To determine whether the conduct is objectively hostile, the Court must consider the totality of the circumstances,

---

[3] As noted above, Atwell recounted an incident in which Afanasenko stated "All the black mechanics here need to be fired, because I don't believe there is a good black mechanic."  Atwell Aff. ¶3.  Atwell also suggests that though Afanasenko subjected Atwell's white counterpart Danowski to similar disrespect and criticism, Afanasenko did not do so to the extent that it would undermine Danowski's authority over the mechanics he supervised. Atwell Aff. ¶5.

including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quoting Harris v. Forklift Sys., 510 U.S. 17, 23 (1993)). "The standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking the ordinary tribulations of the workplace." Wang v. Metro. Life Ins. Co., 334 F. Supp. 2d 853, 864 (D. Md. 2004); see also Jeffers v. Thompson, 264 F. Supp.2d 314, 331 (D. Md. 2003); Porter v. Nat'l Con-Serv, Inc., 51 F.Supp. 2d 656, 659 (D. Md. 1998).

Atwell bases his hostile work environment claim on the following assertions: (1) Afanasenko talked down to him and belittled him; (2) Afanasenko undermined his authority by contradicting his instructions to the mechanics he supervised and telling the mechanics that Atwell does not know anything; (3) Afanasenko reassigned administrative duties from Atwell to his white counterpart Ward; and (4) Afanasenko assigned him to work long hours and weekends.

While it is clear that Atwell and Afanasenko had a contentious working relationship, none of the complained of conduct rises to the level of creating an abusive work environment. The conduct that Atwell complains about was never

physically threatening nor does Atwell indicate that he felt
humiliated; instead it appears that he became hardened to
Afanasenko and began dealing with him very curtly, verging on
being insubordinate, as evidenced by several of the emails sent
between the parties.  Atwell argues that Afanasenko's conduct
interfered with his ability to do his job because, by
criticizing him in front of the mechanics he supervised,
Afanasenko undermined his credibility to continue as their
supervisor.  He suggests that such an attack should be
considered sufficiently severe and pervasive to meet the
standard for a hostile work environment.  Notwithstanding, he
cites no cases to support this contention nor does he provide
any specific facts or evidence to indicate that Afanasenko's
conduct did indeed affect his ability to manage the mechanics.

The Fourth Circuit has recognized that though discord in
the workplace may account for bruised egos and wounded feelings,
"[s]ome rolling with the punches is a fact of workplace life."
Sunbelt Rentals, 521 F.3d at 315.  When dealing with cases that
involve personality conflicts or differences of opinion between
employees and supervisors, it has refused "to transmute such
ordinary workplace disagreements between individuals of
different races into actionable race discrimination."  Hawkins
v. Pepsico, Inc., 203 F.3d 274, 276 (4th Cir. 2000).

Atwell's is not a case in which he has had to face repeated racial epithets, physical threats, or other indicia of hatred. See Demby v. Preston Trucking Co., 961 F. Supp. 873 (D. Md. 1997) (plaintiff was repeatedly confronted with racial epithets and disparate treatment, and his work area was vandalized with a swastika and offensive and threatening language); Collier v. Ram Partners, Inc., 159 F. Supp. 2d 889 (D. Md. 2001) (plaintiff subjected to repeated racial epithets and physical threats); Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126 (4th Cir. 1995) (Iranian plaintiff called names like "the local terrorist," "camel jockey," and "the Emir of Waldorf" on an almost daily basis, was denied certain benefits, and suffered an ulcer because of the stress).  Rather, he describes the nondiscriminatory but disharmonious workplace that the Fourth Circuit has expressly declined to police.  Sunbelt Rentals, 521 F.3d at 315-316; see also Khoury v. Meserve, 268 F. Supp. 2d 600 (D. Md. 2003) (Court found no hostile work environment when supervisor unfairly disciplined and criticized plaintiff, was generally disrespectful, and on one occasion yelled at her that she was incompetent while prohibiting her from leaving until he was done yelling); Cephas v. Pepsi Bottling Group, Inc., No. 04-2269, 2005 U.S. Dist. LEXIS 41934, 9-11 (D. Md. Dec. 6, 2005) (Court found no hostile work environment when co-workers

directed profanity at plaintiff, verbally harassed him and
pushed office supplies off a desktop onto his lap).

It is clear that as the relationship between Atwell and
Afanasenko continued to sour the work place became an
uncomfortable place for Atwell, but this does not mean that the
unfortunate situation is actionable under Title VII.  As such,
this Court must grant summary judgment in favor of ASR with
regard to Atwell's hostile work environment claim.

### B. Retaliation

Atwell's retaliation claim is based on his allegation that
ASR terminated his employment because he complained to the ASR
human resources department about Afanasenko's alleged
discriminatory conduct.  Plaintiff concedes that this claim must
be analyzed pursuant to the burden shifting framework found in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Opp'n at
1; see Thompson v. Potomac Electric Power Co., 312 F.3d 645, 650
(4th Cir. 2003).  The McDonnell Douglas framework requires that
Plaintiff carry the initial burden of establishing a prima facie
case.  Id. at 802.  If the plaintiff is able to make his case,
this creates an inference of retaliation that the employer must
then rebut by offering a legitimate, non-discriminatory reason
for the termination of plaintiff's employment.  Id.  If the
employer is able to articulate such a reason, then plaintiff
must show by the preponderance of the evidence that the

employer's reason is pretext, or else his case is over.  Id. at 804; see also Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998).

To make a prima facie case for retaliation under Title VII, Atwell must provide sufficient evidence so that a reasonable jury could find that (1) Atwell engaged in a protected activity; (2) ASR took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the asserted adverse action.  See Thompson, 312 F.3d at 650.  ASR concedes for purposes of summary judgment that Atwell will be able to satisfy the first two elements of a prima facie case for retaliation.  Mot. at 34.  It contests, however, his ability to demonstrate a causal connection between these two events.

According to his affidavit, Atwell spoke to Ron Frey, ASR's human resources manager, on October 13, 2008, about his complaints of harassment, unfair treatment and discrimination. Atwell Aff. ¶ 7.  When Atwell asked what ASR would do about his situation, Frey said that he would give him a response on Thursday.  Id.  That Thursday, October 16, 2008, three days after their conversation, Frey met with Atwell to inform him that his employment was terminated.  Frey Aff. ¶ 8.  Atwell argues that the close temporal proximity between the day he complained and the day he was fired is clear evidence of the

causal relationship between the two events, and so he has established a prima facie case of retaliation.

While closeness in time between an employee making a discrimination claim and an employer firing that employee is generally sufficient to satisfy the causal relationship element of a prima facie case, see Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 443 (4th Cir. 1998), ASR points out that it could not have been retaliating against Atwell because the person who made the decision to fire Atwell was unaware that Atwell had made any complaint about race discrimination. Defendant provided the sworn statement of Stu FitzGibbon, its plant manager, in which he states he was the person who made the determination to fire Atwell and at the time he made his decision he was unaware that Atwell had ever made any allegations of race discrimination, against Afanasenko or anyone else. FitzGibbon Aff. ¶¶ 9, 11.

Atwell acknowledges in his Response that, "[c]learly, the employer [must] be aware of the fact that [an] employee has engaged in protected activity for there to be a viable claim for retaliation." Opp'n at 9. This knowledge requirement is also recognized in the case law. See, e.g., Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the

plaintiff engaged in a protected activity is absolutely necessary to establish the third element of a prima facie case."); Moore, 817 F. Supp. at 1298 ("Proof that the decision-maker was unaware of the protected activity defeats liability because it makes the establishment of a causal connection impossible.")

Atwell attempts to rebut ASR's argument by claiming that even if FitzGibbon did not know that Atwell had made a complaint to Frey, ASR should be charged with this knowledge because Frey should have told FitzGibbon about the complaint when the two spoke about firing him. Opp'n at 10. He cites the recent Supreme Court decision in Staub v. Proctor Hospital, 562 U.S. ___, 131 S. Ct. 1186 (2011), to support this proposition. The Court has closely reviewed this opinion and cannot find the alleged connection.

In Staub,[4] the Supreme Court held that an employer could be found liable "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." Id. at 1194 (emphasis

---

[4] Staub examines allegations of employment discrimination in the context of the Uniformed Services Employment and Reemployment Rights Act (USERRA), which deals with discriminatory actions taken against a person who is a member of the military. In his opinion, Justice Scalia notes that USERRA is very similar to Title VII. Id. at 1191. As such, this Court will accept the reasoning used in Staub as applicable to the Title VII claim before it in this case.

in original).  This holding is about discriminatory firing, not retaliation.  Moreover, even if Frey should have told FitzGibbon about Atwell's complaint, the sworn statements indicate that Frey did not tell FitzGibbon nor does Atwell offer any evidence to suggest that FitzGibbon knew about the complaint.  Atwell does not allege that Frey was racially biased or discriminatory, Atwell Dep. 119, so Frey's failure to tell FitzGibbon about the complaint cannot be viewed as an act motivated by racial animus that was intended to cause an adverse action against Atwell. Therefore, the application of <u>Staub</u> is inapposite and there is no basis to charge ASR with knowledge of the discriminatory complaint prior to Atwell's firing.  <u>See also</u> <u>Featherson v. Montgomery Cty. Pub. Sch.</u>, 739 F. Supp. 1021, 1025-1026 (D. Md. 1990) (rejecting the suggestion that knowledge of an EEO claim can be imputed from one person to another as it is counterfactual and illogical to suggest that a person can make a retaliatory decision based upon information of which he or she is unaware).  Because FitzGibbon, the ASR employee responsible for the decision to fire Atwell, did not know about Atwell's discrimination complaint at the time he made his decision, Atwell is unable to prove that there is a causal connection between his complaint and the adverse employment action.

Moreover, even if Atwell was able to make a prima facie case for retaliation, it is clear from the detailed record

recounted above that Atwell had a history of performance issues and exhibited a pattern of insubordination that escalated during the last few months of his employment.  This record, along with FitzGibbon's affidavit, provides legitimate, non-retaliatory reasons for Atwell's termination, and thus shifts the burden once again to Atwell to show that these reasons were pretext.

Atwell can meet his burden of proving pretext by showing that ASR's explanation is "unworthy of credence" or by offering circumstantial evidence that proves a retaliatory purpose.  See Tsai v. Md. Aviation, 306 Fed. App'x 1, 6 (4th Cir. 2008). Atwell seeks to create doubt as to the legitimacy of ASR's explanation by arguing that the real reason he was fired is that FitzGibbon put all of the blame on him for the poor relationship between he and Afanasenko.  Opp'n at 11.  Instead of investigating and getting to the bottom of the conflict, Atwell argues, FitzGibbon chose to fire Atwell so as to not have to deal with the problem.[5] Id.  Even if this is true, this does not establish pretext.  Firing an employee who the employer believes is causing disharmony in the work place is a legitimate reason for discharge, and it is not for the Court to decide whether or not the belief was wrongly held.  See Hawkins, 203 F.3d at 279. ("when an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, 'it is not our province to decide

---

[5] See also deposition excerpt located in Footnote 2.

whether the reason was wise, fair, or even correct, ultimately,
so long as it truly was the reason for the plaintiff's
termination.'")  As Atwell fails to give the court any reason to
disbelieve ASR's stated, nondiscriminatory reason for his
discharge and fails to provide any evidence that suggests a
retaliatory purpose, the Court must grant summary judgment for
ASR on Count II.

## V.    CONCLUSION

For the foregoing reasons, the Court concludes that
American Sugar Refining, Inc.'s Motion for Summary Judgment will
be granted.  The Court will issue a separate Order.


                                  _____/s/_____
                                  William M. Nickerson
                                  Senior United States District Judge

September 27, 2011